Filed 3/30/23 Future Energy Overseas Group v. Entravision Communications CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| FUTURE ENERGY OVERSEAS GROUP, INC., <br><br> Plaintiff and Respondent, <br><br> v. <br><br> ENTRAVISION COMMUNICATIONS CORP. et al., <br><br> Defendants and Appellants. | B318981 <br><br> (Los Angeles County Super. Ct. No. 20STCV04768) |

APPEAL from orders of the Superior Court of Los Angeles County, Maureen Duffy-Lewis, Judge. Reversed in part, affirmed in part, and remanded with directions.

King & Spalding and Arwen R. Johnson; Boies Schiller Flexner and Eric Brenner for Defendants and Appellants.

Eisner, Jeremiah Reynolds, Ashlee Lin, and Katherine Pierucci for Plaintiff and Respondent.

---

### INTRODUCTION

This case now comes before this court for the second time. It arises out of the 2017 purchase by Appellant Entravision Communications Corp. (Entravision) of a digital media advertising business from respondent Future Energy Overseas Group, Inc. The parties to the transaction had agreed to use a form of alternative dispute resolution (ADR) to resolve disputes arising out of an Earn-Out Agreement that was part of the transaction by referring them to an accounting firm for resolution.

When disputes arose, the parties disagreed about which of them should be referred to the accounting firm for resolution and which, if any, should be decided in the trial court. In the first appeal, this court remanded the case to the trial court with instructions that the court should grant Entravision's motion to compel ADR, identify the specific issues subject to the ADR provision, and stay court proceedings as to those issues. (*Future Energy Overseas Group, Inc. v. Entravision Communications Corp.* (Sept. 24,

2

2021, No. B308533) 2021 Cal.App.Unpub. LEXIS 6088, at *1–*18 (*Future Energy I*) [nonpub. opn.].)[1]

On remand, the trial court started from the premise that a disputed item that encompassed any legal question should be resolved in its entirety by the court. We now conclude that all but two of the disputed items still at issue encompass at least one question of fact within the accounting firm's expertise, and that those questions, though not necessarily the disputed items as a whole, should be answered by the accounting firm. Accordingly, we reverse in part and remand for additional proceedings consistent with this opinion.

## BACKGROUND

### A. The Parties' Transaction and the Earn-Out Agreement

In 2017, Entravision acquired a group of affiliated companies that provided digital-media advertising services (collectively, Headway) from several individuals and corporate affiliates.[2] One of the sellers, Future Energy, was

---

[1] We cite the unpublished opinion in *Future Energy I* as relevant to the law of the case doctrine. (See Cal. Rules of Court, rule 8.1115(b)(1) [prior unpublished opinions may be cited as law of the case].)

[2] Entravision made this acquisition through its subsidiary, appellant Headway Spain Digital Technology Services, S.L.U. For the sake of simplicity, we refer to both entities as Entravision.

3

designated the sellers' representative, authorized to represent the sellers in matters relating to the transaction's governing documents. As part of the transaction, the parties executed an "Earn-Out Agreement," under which Entravision was to pay the sellers additional sums for each year in 2017–2019 (referred to in the agreement as Periods 1–3) in which Headway achieved specified financial targets. If Headway reached certain performance thresholds for the entire three-year period, the agreement provided for an "Overachievement Bonus."

Under the Earn-Out Agreement, Entravision was to provide a yearly statement setting forth its calculations of the business's performance and the payment to which it believed the sellers were entitled. In determining Headway's operating expenses, Entravision was to apply "GAAP," defined as "U.S. Generally Accepted Accounting Principles as consistently applied by [Entravision]."

The Earn-Out Agreement specified various categories to be included in or excluded from operating expenses. For instance, section 1(mm)(iv) of the agreement provided that "expenses relating to marketing and public relations related to Company Products and Services to the extent consistent with the historical operations of the Business" were to be included in operating expenses, and section 1(mm)(vii) provided that expenses relating to accounting, bookkeeping, and financial reporting were to be included. Conversely, section 1(mm)(xiv) of the Agreement excluded expenses for audits and financial statements in accordance with GAAP,

4

section 1(mm)(xi) excluded general allocation of corporate overhead to Headway, and section 1(mm)(xix) excluded interest on loans by Entravision to Headway to the extent such loans do not exceed the amount of cash dividends by Headway to Entravision.

If Future Energy disagreed with Entravision's Earn-Out statement, it was to submit a list of "'Disputed Items'" to Entravision, specifying the basis for each item. Section 2(c) of the agreement stated: "If the parties are unable to resolve any Disputed Items . . . , then such Disputed Items shall be submitted to [an] Accounting Firm . . . which shall be jointly engaged by [Entravision] and [Future Energy] and shall act as an expert in accounting and not an arbitrator to promptly review the Earn-Out Statement and resolve the Disputed Items. . . . In resolving any Disputed Item, the Accounting Firm . . . will base its determination solely on written materials submitted by [Entravision] and [Future Energy] (and not on any independent review)."

### B. The Parties' Disputes and Future Energy's Complaint

A series of disputes later arose about the sellers' entitlement to payments under the Earn-Out Agreement. After Period 1, the parties agreed that the sellers were entitled to the maximum earn-out payment, and Entravision made a partial payment of that amount. In May 2019, however, Entravision claimed it had discovered undisclosed accounting deficiencies that caused it to conclude that the

sellers were not entitled to payments for Periods 1 and 2. Entravision provided an Earn-Out statement for Period 2, reflecting its determination that Headway had not met the specified performance thresholds. Future Energy responded with Disputed Items challenging Entravision's Earn-Out statement for Period 2. In the Disputed Items, Future Energy asserted objections based on GAAP, specific provisions in the Earn-Out Agreement, alleged agreements subsequent to the Earn-Out Agreement, or some combination of the foregoing.

In February 2020, after the parties failed to resolve their differences, Future Energy, in its capacity as the sellers' representative, filed this action against Entravision. The complaint asserted breach of contract and fraudulent misrepresentation, among other claims, and sought the remainder of the Earn-Out payment for Period 1, the maximum payments for Periods 2 and 3, and the maximum overachievement bonus, among other prayers for relief. Future Energy alleged, inter alia, that Headway had met the performance thresholds for all three periods and the overachievement bonus.

The complaint included allegations that were not based on accounting principles. For example, Future Energy asserted that at a November 2018 meeting, the parties entered into an "oral and implied contract" regarding the treatment of certain operating expenses for purposes of the Period 2 Earn-Out calculation. It claimed Entravision had breached this contract. Additionally, Future Energy

asserted that if the sellers were not entitled to the Period 2 Earn-Out payment, Entravision had knowingly or recklessly misrepresented that they would be and used those misrepresentations in extracting certain concessions from the sellers.

### C. Entravision's Motion to Compel ADR as to Period 2 and the Period 3 Disputed Items

In response to Future Energy's complaint, Entravision moved to compel ADR as to 17 Period 2 Disputed Items and to stay the litigation.[3]  Future Energy opposed this motion, contending, inter alia, that the Earn-Out Agreement's ADR provision covered only accounting issues and thus did not reach most of the Disputed Items.  In its reply, Entravision asserted that the ADR provision mandated that all 17 Disputed Items be resolved by an accounting firm, regardless of their nature.  Alternatively, Entravision claimed that the Disputed Items all presented issues within an accounting firm's expertise.

In the interim, Entravision issued a Period 3 Earn-Out statement concluding that the sellers were not entitled to an Earn-Out payment.  Future Energy again disputed Entravision's calculations and provided another set of

---

[3]     Entravision's motion addressed Period 3 and the overachievement bonus only to assert that they were not yet ripe for resolution, as Entravision had not yet issued its Earn-Out statement for Period 3.

7

Disputed Items, raising similar objections to those made as to Period 2. The parties ultimately failed to resolve their differences as to Period 3 as well, but Entravision did not file a new motion to compel ADR targeting Period 3 Disputed Items before the trial court's ruling on its motion as to Period 2.

### D. The Trial Court's Initial Ruling and the Prior Appeal

Following a hearing on Entravision's motion to compel ADR as to Period 2, the trial court determined that the Earn-Out Agreement's ADR provision was not a traditional arbitration clause and that the action involved many non-accounting issues that were not subject to the ADR provision. The court stated it was denying the motion to compel but also that non-arbitrable claims would be litigated first, and the remaining accounting issues could then be referred to the accounting firm. The court did not specify the issues it determined were subject to the ADR provision and did not address Entravision's request to stay the litigation as to issues subject to ADR. Entravision appealed.

In *Future Energy I*, this court reversed in part the trial court's order, concluding that the court validly exercised its discretion to delay the ADR process pending adjudication of non-arbitrable issues but erred in failing to grant the motion to compel ADR, identify the specific issues subject to ADR, and stay court proceedings as to those issues. (*Future Energy I, supra*, 2021 Cal.App.Unpub. LEXIS at *2.)

Reviewing the scope of the ADR provision de novo, this court rejected Entravision's argument that the ADR provision encompassed all Disputed Items "no matter whether they involved accounting or legal issues." This court held that, based on the provision's language, the accounting firm was to address "only those issues that could be resolved through the application of accounting principles." (*Id.* at *13, fn. 8.) We further stated that, "[o]n remand, the court should identify those Disputed Items (or portions thereof) that raise accounting issues and are thus subject to the ADR provision. The court should then stay the litigation as to those issues . . . ." (*Id.* at *19.) We explained that the litigation of "non-arbitrable, legal issues" could proceed in court. (*Ibid.*)

### E. Subsequent Proceedings in the Trial Court

Following the issuance of the opinion in *Future Energy I,* the parties submitted briefing to the trial court addressing the arbitrability of individual Period 2 Disputed Items.[4] On November 4, 2021, the trial court issued a minute order identifying the Disputed Items subject to ADR and concluding that most were not. On January 12, 2022, the trial court vacated the November 4, 2021, order because it had been issued before the remittitur and reissued it as of that date. The court concluded that three of the 17 Period 2

---

[4] Future Energy conceded that three of these Disputed Items were subject to ADR, while Entravision conceded that two must be litigated in court.

Disputed Items were subject to ADR, as conceded by Future Energy, but that the remaining Disputed Items were "not to be handled by an accountant as they pertain to legal issues including contract interpretation, fraud determination and contract enforceability."

In the interim, Entravision moved to compel ADR as to 21 Period 3 Disputed Items.  Future Energy conceded that seven of the Disputed Items were subject to ADR, while Entravision conceded that two must be litigated in court.[5] The trial court concluded that seven of the 21 Period 3 Disputed Items were subject to ADR as conceded by Future Energy, but that none of the remaining Disputed Items were "to be handled by an accountant as they pertain to legal issues including contract interpretation, fraud determination and contract enforceability."  In addition, the court decided to allow ADR to proceed first and stayed the litigation pending the accounting firm's resolution of the accounting issues.

Entravision appealed both the January 12, 2022, order as to Period 2 and the January 25, 2022, order as to Period 3.

---

[5]     In its filings, Entravision included the declaration of accounting expert Greggory Peat, who opined, inter alia, that most of the 12 remaining Period 3 Disputed Items involved "the kind of accounting issues that accounting practitioners have the expertise to resolve, and are regularly called on to resolve in practice."

# DISCUSSION

In this appeal, Entravision challenges the trial court's denial of ADR as to a total of 22 of the Disputed Items arising out of the Earn-Out statements for Periods 2 and 3. Entravision argues that all 22 involve accounting issues subject to ADR. Future Energy disputes that and also contends that Entravision's appeal as to Period 2 should be dismissed because the January 12, 2022, order was not appealable. As discussed below, we find no procedural infirmity in the Period 2 appeal. Moreover, we conclude that 20 of the 22 Disputed Items present at least one question of fact within the expertise of the accounting firm and that these questions, though not necessarily the entire Disputed Item to which each pertains, are subject to resolution by the accounting firm.

## A. *Appealability of the Period 2 Order*

An order denying a motion to compel arbitration, in whole or in part, is appealable. (See Code of Civil Procedure section 1294, subd. (a).) The court's January 12, 2022, order identifying which Period 2 Disputed Items were subject to ADR amounted to a denial of the motion to compel as to the remaining Disputed Items. The January 12, 2022, order was accordingly appealable. (See, e.g., *In re Marriage of Loya* (1987) 189 Cal.App.3d 1636, 1638 ["it is not the label but rather the substance and effect of a court's judgment or order which determines whether or not it is appealable"].)

11

## B. The Merits

### 1. Governing Principles

Code of Civil Procedure section 1281.2 requires a court to order arbitration of a particular controversy if it determines that an agreement to arbitrate it exists. (*Ibid*.) The statute embraces not only traditional arbitrations but also alternative forms of dispute resolution, such as valuations, appraisals, and audits, in which an independent expert resolves specific questions of fact. (See *id.*, § 1280, subd. (a); *Coopers & Lybrand v. Superior Court* (1989) 212 Cal.App.3d 524, 534.) These proceedings have been characterized as "a special form of limited arbitration." (*Doan v. State Farm General Ins. Co.* (2011) 195 Cal.App.4th 1082, 1094 (*Doan*).)

The powers of a neutral accountant, appraiser, or similar expert in such a proceeding are "far more limited" than those of an arbitrator. (*Doan, supra,* 195 Cal.App.4th at 1094, citing *Jefferson Insurance Co. v. Superior Court* (1970) 3 Cal.3d 398, 402 (*Jefferson Insurance*).) The expert is tasked with deciding factual questions within his or her expertise, not with construing statutes, interpreting contracts, or deciding other legal questions. (See *ibid.*; *Jefferson Insurance, supra,* 3 Cal.3d at 403 ["'the function of appraisers [in insurance ADR proceeding] is to determine the amount of damage resulting to various items submitted for their consideration. It is certainly not their function to resolve questions of coverage and interpret provisions of the policy'"].)

## 2. *The Parties' ADR Agreement*

Here, the parties' Earn-Out Agreement contemplates a limited ADR proceeding in which the accounting firm was to "act as an expert in accounting and not an arbitrator," a phrase commonly used to indicate the parties' intent that the accountant answer only factual questions pertaining to accounting.  (See *Penton Business Media Holdings, LLC v. Informa PLC* (Del.Ch. 2018) 252 A.3d 445, 460–466.) Nothing in the agreement suggests the parties intended the accounting firm to resolve legal questions such as the correct interpretation of contractual provisions.  Entravision nevertheless argues that the accounting firm should be allowed to decide certain matters of contractual interpretation.

In *Future Energy I*, we distinguished "accounting" from "legal issues," and concluded that litigation of "non-arbitrable, legal issues" between the parties should proceed in court (*id.* at *19).  We agree with Entravision that an accounting expert presiding over a limited ADR proceeding may *apply* a contractual provision regarding the treatment of certain expenses to a particular set of facts.  But an accountant may not settle a dispute over the legal meaning of the provision, a task reserved for the court.  (See *Jefferson Insurance, supra,* 3 Cal.3d at 403; *Doan, supra,* 195 Cal.App.4th at 1094.)  And a Disputed Item should not be withheld in its entirety from the accounting firm's review merely because a party has raised a legal contention that could affect its disposition.

13

Under certain circumstances, a legal determination might effectively moot an accounting issue. But the mere potential for mootness does not turn an accounting question into a question for the court. (See Code Civ. Proc., § 1281.2.) Instead, the statute grants courts discretion to "delay" arbitration if "the determination of [non-arbitrable] issues may make the arbitration unnecessary." (*Ibid.*; accord, *Doan*, *supra*, 195 Cal.App.4th at 1100 ["the trial court has discretion to stay an order for arbitration if 'the adjudication of the nonarbitrable claims in court might make the arbitration unnecessary'"].)

As a result of concessions by the parties during the pendency of these proceedings,[6] only the following 22 Disputed Items remain at issue: Disputed Items 4, 7, 9, 10, 11, 13, 14, 15, 16 & 17 from Period 2 and Disputed Items 3, 6, 7, 8, 9, 12, 16, 17, 18, 19, 20 & 21 from Period 3.[7] In *Future Energy I*, we applied a de novo standard of review to determine the scope of the parties' arbitration provision. (See *Future Energy I*, *supra*, 2021 Cal.App.Unpub. LEXIS, at *4.) Future Energy now contends the trial court's denial of

---

[6] The parties agreed in the trial court on the treatment of 14 Disputed Items. And Entravision has chosen not to challenge on appeal the denial of ADR as to two additional Disputed Items.

[7] A table provided by Entravision identifying 17 Disputed Items for Period 2, including Future Energy's objections and Entravision's responses, is appended below. We refer to a Disputed Item for this period as "Disputed Item 2:[X]." A table of the 21 Disputed Items for Period 3 is also appended below. We refer to Disputed Items for this period as "Disputed Item 3:[X]."

14

accounting ADR as to the remaining 22 Disputed Items is reviewable only for abuse of discretion. We disagree. The parties here agreed to accounting ADR as a form of limited arbitration, making the cases upon which Future Energy relies inapposite. Some deal with the court's discretion to delay, not deny, accounting ADR. (See *Alexander v. Farmers Ins. Co.* (2013) 219 Cal.App.4th 1183, 1196, fn. 7; *Lee v. California Capital Ins. Co.* (2015) 237 Cal.App.4th 1154, 1164; *Doan, supra,* 195 Cal.App.4th at 1100.) Another concerns the court's authority to appoint an accounting referee in the absence of a contractual ADR provision. (See *Walsh v. Jack Rubin & Sons, Inc.* (1960) 182 Cal.App.2d 652, 655.) Future Energy asserts that conflicting evidence before the trial court regarding the arbitrability of the remaining Disputed Items warrants the more deferential standard of review. But our review of the record reveals only competing arguments, not conflicting evidence. Accordingly, we decide de novo the arbitrability of the issues presented by the 22 remaining Disputed Items. (See *RN Solution, Inc. v. Catholic Healthcare* West (2008) 165 Cal.App.4th 1511, 1522 ["We review the scope of an arbitration provision de novo when, as here, that interpretation does not depend on conflicting extrinsic evidence"]; *Doan, supra,* 195 Cal.App.4th at 1100 ["the rules governing arbitration apply with equal force to insurance appraisals"].)

### 3. *Application*

### a. *Issues subject to ADR*

### i. GAAP and consistency

Several of the Disputed Items present a question of whether the treatment of the relevant expenses complied with GAAP, "as consistently applied by [Entravision]." Whether a particular accounting treatment complied with GAAP and whether it was consistent with prior treatment are questions of fact within an accountant's expertise. (See *Campeau Corp. v. May Dept. Stores Co.* (S.D.N.Y. 1989) 723 F.Supp. 224, 228 [accounting ADR provision covered disputes regarding accounting methodology]; *Seed Holdings, Inc. v. Jiffy International AS* (S.D.N.Y. 2014) 5 F.Supp.3d 565, 584 [whether parties calculations failed to comply with GAAP was "squarely within the scope of arbitrable issues" under accounting ADR provision]; *Alliant Techsystems, Inc. v. MidOcean Bushnell Holdings, L.P.* (Ch. Apr. 24, 2015, No. 9813-CB) 2015 Del. Ch. LEXIS 118, at \*32 ["When it comes to deciding questions of GAAP . . . , accounting firms are particularly well-positioned to do so"].)

In connection with many of the Disputed Items that raise GAAP and consistency issues, Future Energy argues that the dispute is over "whether the Agreement allows [Entravision] to classify these items differently in Period 2 [or 3] than it did in Period 1." However, the dispute here is not over the meaning of the contractual term "GAAP," which includes the concept of consistency, but over whether

Entravision's accounting practices complied with these established accounting principles. Accordingly, the following matters involving consistency and compliance with GAAP are subject to ADR:

- Disputed Items 2:7 and 3:16 - Future Energy's objections that the classification of certain tax expenses was inconsistent with prior treatment
- Disputed Item 2:14 - Future Energy's objection that the relevant expenses were previously excluded from operating expenses, and Entravision's contention that exclusion of tax-related expenses would result in an understated EBITDA
- Disputed Item 2:15 - Future Energy's objection that the relevant expenses were previously excluded from operating expenses
- Disputed Items 2:16 and 3:21 - Future Energy's objection that Headway's bad-debt reserves should be calculated based on the same bad-debt allowance used for Period 1
- Disputed Items 2:17 and 3:19 - Future Energy's objections that foreign currency losses should be excluded from operating expenses because they (a) did not relate to Headway's core business and were not within its management's control, and (b) were previously excluded from operating expenses
- Disputed Item 3:3 - Entravision's contention that including the reversal of the accrual of certain unpaid

bonuses would be inconsistent with prior treatment of these payments[8]

- Disputed Item 3:12 - Future Energy's objection that the inclusion of the relevant penalties and interest was inconsistent with prior treatment of these expenses
- Disputed Item 3:17 - Future Energy's objection that the relevant expenses were previously excluded from operating expenses
- Disputed Item 3:20 - Entravision's contention that Future Energy's proposed adjustment would be duplicative

### ii. Allocation

Several of the Disputed Items present a question of whether relevant expenses were properly allocated to Headway or constituted allocation of corporate overhead or marketing expenses unrelated to Headway's business, which the Earn-Out Agreement prohibited. These matters, too, involve questions of fact within an accountant's expertise.

---

[8] In this Disputed Item, Future Energy objected that most of the reversal of these bonuses' accrual should be included in operating expenses because most of the bonuses did not relate to "Key Employees," as defined under the Earn-Out Agreement. In addition to its consistency argument, Entravision responded that the reversal was excludable under the Earn-Out Agreement because it related to "Employee Payments," as defined by the purchase agreement. These contentions all relied solely on the terms of the relevant agreements, raised no factual issue within an accountant's expertise, and are therefore not subject to the accounting ADR.

(Cf. *Catalyst Pharma Group, Inc. v. ICON Clinical Research, Inc.* (D.Del., Mar. 31, 2010, No. 09-391-SLR) 2010 U.S.Dist. LEXIS 31336, at *5 ["an accountant charged with calculating EBITDA (consistent with the definition of EBITDA in the Purchase Agreement) will review such matters as the appropriate allocation of overhead expenses, bringing to such issues an expertise [the court] do[es] not have"].) The following matters involving allocation issues are subject to ADR:

- Disputed Items 2:9 and 3:7 - Future Energy's objection that the relevant marketing or public relations expenses were incurred by Entravision and should not be attributed to Headway
- Disputed Items 2:11 and 3:9 - Future Energy's objections that the inclusion of the relevant consulting fees represented an improper general allocation of corporate overhead
- Disputed Item 2:14 - Future Energy's objection that the inclusion of the relevant expenses represented an improper general allocation of corporate overhead
- Disputed Item 3:17 - Future Energy's objection that the inclusion of expenses for the relevant services represented an improper general allocation of corporate overhead
- Disputed Item 3:18 - Future Energy's objection that the inclusion of the relevant rent and related expenses represented an improper general allocation of corporate overhead

19

### iii.  Salary of Headway's Controller

Disputed Items 2:10 and 3:8 concern the inclusion of Headway's controller's salary in its operating expenses. Future Energy objected that these expenses should be excluded under section 1(mm)(xiv) of the Earn-Out Agreement, as expenses for audits and financial statements. Entravision, on the other hand, claimed that these expenses did not concern audits or financial statements and were properly included under section 1(mm)(vii), because the controller's duties included accounting, bookkeeping, and financial reporting.  This factual dispute regarding the correct classification of these expenses and the scope of the controller's duties is within an accountant's expertise.

### iv.  Bonus Paid to Victor José Ruiz Ortiz

In Disputed Item 2:13, Future Energy objected that this bonus should be excluded from operating expenses under section 1(mm)(xxvi) of the Earn-Out Agreement. Entravision responded, inter alia, that this bonus was not given for the purpose described in that provision.[9]  Whether

---

[9]  The version of the agreement in the record does not include section 1(mm)(xxvi), and it appears it may have been part of a subsequent amendment that is not in the record.  However, Future Energy does not dispute Entravision's characterization of this provision.

a payment was made for a defined purpose is a factual matter within an accountant's expertise.

### b. *Disputed Items not subject to ADR*

The two remaining Disputed Items present legal issues that may be litigated only in court, such as the existence and enforceability of additional agreements between the parties about certain accounting practices and the correct interpretation of various provisions in the Earn-Out Agreement.

### i. Disputed Item 2:4

Future Energy's sole objection in this Disputed Item was that a prior agreement by the parties governed the treatment of the relevant expenses. Accordingly, this Disputed Item presented no accounting-related dispute between the parties.

### ii. Disputed Item 3:6

This Disputed Item concerned the inclusion of interest on loans by Entravision to Headway. Future Energy objected that under Section 1(mm)(xix) of the Earn-Out Agreement, interest on such loans must be excluded to the extent those loans do not exceed the amount of cash dividends by Headway to Entravision. Entravision responded that Headway had issued it no cash dividends, and thus the entire amount of interest was properly included in operating expenses. Future Energy has made no claim,

21

either in the Disputed Items before the trial court or on appeal, that Headway had issued qualifying dividends. Accordingly, any remaining dispute regarding this issue presents question of law not subject to ADR.

## DISPOSITION

The trial court's orders are reversed in part and affirmed in part. The matter is remanded for further proceedings consistent with this opinion. Entravision shall recover its costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

SCADUTO, J.*

We concur:

COLLINS, Acting P.J.

CURREY, J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to Article VI, section 6, of the California Constitution.

23

# APPENDIX
## Period 2 Disputed Items

**EXHIBIT A**
**Buyer Response - July 12, 2019**

Exhibit A-1
Disputed Items – Buyer's Adjustments
(as set forth on Schedule of Adjustments on Exhibit B to Letter dated May 20, 2019 re: Earn-Out Statement (Period 2))

| Disputed Item # | Buyer's Description[1] | Disputed Amount[2] | Sellers' Explanation[3] | Buyer's Response |
|---|---|---|---|---|
| 1 | Adjustment to record 2018 revenue reversals recorded in error during Q1 2019 (out of period) through issuance of credit invoices. | $325,619.21[4] | The Buyer has noted that $90,608.97 in invoices were duplicated. These are not duplicate invoices. There is a process in place to ensure that the revenue booked was correct.<br><br>The remaining $235,010.24 represents invoices that were not collected upon. We do not believe that this should be an adjustment to net revenue and should rather be considered a write off of the account receivable with a corresponding decrease in the allowance for doubtful accounts. | The $90,608.97 adjustment is required to correct the 2018 P&L error resulting from Headway's recognition of these identified duplicate invoices during the NetSuite system implementation and accounting information migration process. Failure to record the $90,608.97 adjustment would result in unsubstantiated income during 2018, and thus, Sellers' proposed $90,608.97 adjustment is inconsistent with the terms of the Earn-Out Agreement, including the requirement that Net Revenue and/or EBITDA be calculated in accordance with GAAP.<br><br>The remaining $235,010.24 adjustment is required because the allowance for doubtful accounts would be understated if the adjustment were to be recorded against the allowance for doubtful accounts. An understatement of the allowance for doubtful accounts would overstate accounts receivables during Period 2, inconsistent with the terms of the Earn-Out Agreement, including the requirement that Net Revenue and/or EBITDA be calculated in accordance with GAAP. |

---

[1] *See* Buyer's Period 2 Earn-Out Statement.
[2] *See* Sellers' Objection Notice.
[3] *See* Sellers' Objection Notice.
[4] Sellers have disputed $325,619.21 of Buyer's $547,709 deductions made in calculating Net Revenue in order to correct errors in 2018 recorded revenue. The difference of $222,090 is non-disputed and included in the listing of non-Disputed Items at Exhibit A-3.

**EXHIBIT A**
**Buyer Response - July 12, 2019**

| Disputed Item # | Buyer's Description[1] | Disputed Amount[2] | Sellers' Explanation[3] | Buyer's Response |
|---|---|---|---|---|
| 2 | Operating Expense exclusion up to $800,000 pursuant to Section 1(mm)(xxi) of the Earn-Out Agreement, subject to Seller's submission of information establishing compliance with applicable conditions. | $800,000 | In accordance with the Email Memorandum sent by Chris Young on 12/7/2018 to Martín Kogan, the add-backs under Section 1(mm)(xxi) of the Earn-Out Agreement were approved. In addition all add backs were included in the reports sent to the Headway management team during 2018 (Exhibits B and C). | In order to qualify for exclusion from Operating Expenses under Section 1(mm)(xxi), Sellers are required, *inter alia*, to demonstrate that any such items were actually incurred during 2018 and specifically identified in the 2018 Operating Budget as items to be excluded, consistent with Buyer's letter to the Sellers dated June 11, 2018.<br><br>Sellers have not provided any information to establish that their proposed adjustment complies with these requirements. |
| 3 | Operating Expense exclusion of up to $759,000 pursuant to Section 1(mm)(xxvii) of the Earn-Out Agreement, Letter dated 06/11/18 and Chris Young Email Memorandum dated 12/08/18, subject to Seller's submission of Information establishing compliance with applicable conditions. | $758,742 | In accordance with the Email Memorandum sent by Chris Young on 12/7/2018 to Martín Kogan, the add-backs under Section 1(mm)(xxi) of the Earn-Out Agreement were approved. In addition all add backs were included in the reports sent to the Headway management team during 2018 (Exhibits B and C). | In order to qualify for exclusion from Operating Expenses under Section 1(mm)(xxvii), Sellers are required, *inter alia*, to demonstrate that any such items were actually incurred during 2018 and that the following conditions are met: (a) such Operating Expenses are specifically identified as an item to be excluded from Operating Expenses pursuant to a written request by the Seller Representative to Buyer setting forth detailed information regarding the intended use and amount of such investment and the related return on such investment, and (b) such request is approved in writing by Buyer, in Buyer's sole and absolute discretion, consistent with Buyer's letter to the Sellers dated June 11, 2018.<br><br>Sellers have not provided any information to establish that their proposed adjustment complies with these requirements.<br><br>Note: Sellers referenced Section 1(mm)(xxi) in their Objection to this Disputed Item; however, this item is unrelated to the Headway Business as required under that section, and we believe Sellers likely intended to reference Section 1(mm)(xxvii). |

| Disputed Item # | Buyer's Description[1] | Disputed Amount[2] | Sellers' Explanation[3] | Buyer's Response |
|---|---|---|---|---|
| 4 | Adjustment to reverse credits to expense recorded in error during 2018 (see May 6, 2019 mgmt. rep letter, Appendix B, Item #5). | $791,763 | As mentioned in Section 3 of this letter, the calculation of the Net Revenues and Operating Expenses for the Period 1 are final and non-appealable. As a result, in Period 2, no adjustments should be applied in connection with sales and expenses incurred in 2017. | The $791,763 adjustment is required to reverse income recorded as a reduction to Operating Expenses in error during 2018. Failure to record this adjustment would result in understated Operating Expenses because the income (credit) recorded in error during 2018 related to sales and expenses incurred during 2017, which Sellers concede should not be applied during Period 2. Consequently, recognition of this adjustment is required under the terms of the Earn-Out Agreement, including the requirement that Operating Expenses be calculated in accordance with GAAP. |
| 5 | Adjustment to December 31, 2018 Accounts Receivable balances that were overstated in error. | $537,973 | Any adjustment of accounts receivable should have already been included in the allowance for doubtful accounts and no additional expenses should be included to the Operating Expenses in this regard. | The $537,973 adjustment is required because the adjustment properly eliminates unsubstantiated debits (i.e., unsubstantiated assets) in the Business' Period 2 accounts receivables balances. The allowance for doubtful accounts does not include consideration for such unsubstantiated assets, and thus, recognition against the allowance for doubtful accounts as Sellers propose is inconsistent with the terms of the Earn-Out Agreement, including the requirement that Operating Expenses be calculated in accordance with GAAP. |
| 6 | Adjustment for unrecorded penalties and interest in connection with 2016 VAT payable (as defined in May 2019), subject to adjustment upon Seller's submission of information establishing appropriate accrual timing. | $436,652 | In accordance with the terms of the Earn-Out Agreement, interest expenses are excluded as Operating Expenses. Please see Section 1.(mm)(xxiii). | These expenses are penalties charged for failure to comply with VAT legal requirements, and are therefore not excluded pursuant to Section 1(mm)(xxii) of the Earn-Out Agreement. Recognition of this adjustment is required under the terms of the Earn-Out Agreement, including the requirement that Operating Expenses be calculated in accordance with GAAP. |

AA 300

| Disputed Item # | Buyer's Description[1] | Disputed Amount[2] | Sellers' Explanation[3] | Buyer's Response |
|---|---|---|---|---|
| 7 | | $140,954 | In accordance with the calculations made in 2017 (Exhibit A), transaction taxes were not included as an Operating Expense. | The $140,954 adjustment is required to properly classify non-income tax related expenses as Operating Expenses during 2018, consistent with the Earn-Out Agreement, including the requirement that Operating Expenses be calculated in accordance with GAAP. |
| 8 | Interest on loans made by Seller to the Acquired Companies. | $15,000 | In accordance with Section 1.(mm).(xix) of the Earn-Out Agreement, interest on loans should be excluded from EBITDA. | The $15,000 adjustment relates to a loan made by Buyer to the Acquired Companies, and is therefore subject to Section 1(mm)(xix) of the Earn-Out Agreement, in which the parties agreed such interest in excess of cash dividends made by the Acquired Companies to the Buyer or any of its Affiliates would not qualify for exclusion from Operating Expenses. The Acquired Companies have made no such cash dividends to Buyers or any of its affiliates and, consequently, total interest incurred during 2018 attributable to this loan should be included in Operating Expenses. |
| 9 | Expenses related to marketing and public relations related to the Company Products and Services. | $8,640 | In accordance with the terms of the Earn-Out Agreement (Section 1.(mm).(iv), Operating Expenses should only include expenses relating to marketing and public relations related to the Company Products and Services to the extent consistent with historical operations of the Business or mutually agreed upon. This expense incurred by the Buyer was not agreed to by the Sellers, and as a result, should not be added to the calculation of the Operating Expenses of Period 2. Such agreement was further supported by Section 1.(mm)(xii) of the Earn-Out Agreement. | The $8,640 adjustment represents expenses for the marketing and public relations of Company Products and Services, and thus, inclusion as Operating Expenses is consistent with Section 1(mm)(iv) of the Earn-Out Agreement. During Period 2, the Company's marketing and public relations function (including associated expense) was transitioned from the local marketing and public relations firm to The Plunkett Group. The $8,640 amount was derived by taking the total marketing and public relations service fees charged by The Plunkett Group post-transition, multiplied by the pro-rata portion of fees attributable to Headway by dividing the number of Headway specific press releases (3) by the total number of press releases issued during 2018 (49). Consequently, this amount is directly related to the marketing and sale of Headway Products and Services during 2018, and thus, should be included within Operating Expenses. |

4

| Disputed Item # | Buyer's Description[1] | Disputed Amount[2] | Sellers' Explanation[3] | Buyer's Response |
|---|---|---|---|---|
| 10 | Expense attributed to Headway controller (U.S.) | $43,333 | In accordance with Section 1.(mm).(xiv) all fees and expenses for any external or internal audits allocated to the Business and any fees and expenses for the preparation of any financial statements in accordance with GAAP shall be excluded from Operating Expenses. | The $43,333 expense attributable to the Headway Controller's salary as Operating Expenses is consistent with the terms of the Earn-Out Agreement, including Section 1(mm)(vii). The Headway Controller's role and responsibilities included managing the accounting, bookkeeping, and financial reporting with respect to the Business. Consequently, this amount should be included within Operating Expenses. |
| 11 | Expense attributed to consulting fees related to the development, provision, marketing, sales and other operations related to the Business. | $267,500 | In accordance with Section 1.(mm).(xi) any general allocation of corporate overhead, such as the consulting services required by the Buyer should not be included as an Operating Expense. It is worth mentioning that we understand these fees belong to Juan Saldívar, which is a member of the Board of EVC. Under no circumstance is this a cost that should be attributed as an Operating Expense of the Acquired Companies. | The $267,500 expense is attributable to consulting services provided by SWS Servicios des Estrategia SC ("SWS"), a consulting company engaged by Buyer that provides services related to the development, provision, marketing, sale and other operations related to Headway Products and Services, including during 2018.<br><br>Total fees paid to SWS during 2018 were $535,000, 80% of which was directly related to the development, provision, marketing, sale, and/or other operations related to Headway Products and Services. In an effort to quantify these Operating Expenses in good faith, the Buyer (conservatively) allocated only 50% ($267,500 = $535,000 x 50%) of these fees as Operating Expenses during Period 2.<br><br>SWS is owned and operated by Juan Saldivar, who also serves as a member of Entravision's Board of Directors. However, the amounts attributed to this item solely represent fees paid to SWS for the work of the SWS team[5] related to the Headway business, and did not include any amounts received by Mr. Saldivar for his service as a Board member. |

---

[5] The SWS personnel who provided such consulting services to the Headway Business through SWS were Juan Saldivar and Paula Velasco.

| Disputed Item # | Buyer's Description[1] | Disputed Amount[2] | Sellers' Explanation[3] | Buyer's Response |
|---|---|---|---|---|
| 12 | | $212,607 | N/A | After Buyer's receipt of the Seller Objection, Buyer discovered additional $212,607 of unrecorded agency commissions owed to clients to be included in the calculation of Operating Expense under the terms of the Earn-Out Agreement, including the requirement that Operating Expenses be calculated in accordance with GAAP. |

Total:   $4,126,176.21

**Exhibit A-2**
**Disputed Items – Sellers' Adjustments**

| Disputed Item # | Sellers' Explanation[6] | Sellers' Amount[7] | Buyer's Response | Disputed Amount |
|---|---|---|---|---|
| 13 | This expense is the bonus paid to Victor José Ruiz Ortiz in connection with the acquisition of Smadex, and as a result should be excluded from Operating Expenses in accordance with Section 1(mm).(xxvi) of the Earn-Out Agreement. | $122,446[8] | The $122,446 bonus expense for the bonus paid to Victor José Ruiz Ortiz is required to be included within Operating Expenses pursuant to the terms of the Earn-Out Agreement, including Section 1(mm). The $122,446 adjustment does not qualify for exclusion from Operating Expenses under Section 1(mm)(xxvi) of the Earn-Out Agreement because this bonus expense was not granted to Mr. Ortiz for the purpose described in this Section 1(mm)(xxvi) and, *inter alia*, (a) neither the amount nor the employee is specifically identified in the Operating Budget for Period 2, and (b) the employee was not jointly agreed upon by Seller Representative and Buyer in accordance with Section 1(mm).(xxvi). | $122,446 |
| 14 | Corporate expenses excluded in accordance with Section 1.(mm).(xi) and (xiv). of the Earn-Out Agreement (Please see detail in Exhibit D). Please note that in addition these expenses were not included as Operating Expenses in the Earn-Out Statement of Period 1 (Exhibit A), nor in the reports to the management during 2018 (Exhibit B and C). | $917,086 | The Buyer agrees with $2,897 of Seller's Disputed Item under Section 1(mm)(xiv) of the Earn-Out Agreement.<br><br>Of the remaining $914,189 of expenses:<br><br>• $631,059 of non-income tax related expenses recorded during Q2 and Q3 of 2018 were effectively eliminated during Q4 2018, and thus, this has already been credited back to Sellers. Excluding this expense would result in understated EBITDA because the expense is required to properly offset the benefit taken during Q4 2018 associated with these contingencies;<br><br>• $129,696 of expenses attributable to fees for the preparation of a transfer pricing study and related matters | $914,189 |

---

[6] *See* Sellers' Objection Notice.
[7] *See* Sellers' Objection Notice.
[8] Sellers included in its Objection Notice this item as an increase to Buyer's deduction made in calculating Operating Expenses for Jordi de los Pinos' 2018 bonus expense. Jordi de los Pinos' 2018 bonus expense is non-disputed and included in the listing of non-Disputed Items at Exhibit A-3.

| Disputed Item # | Sellers' Explanation[6] | Sellers' Amount[7] | Buyer's Response | Disputed Amount |
|---|---|---|---|---|
| | | | associated with the Business qualifies as Operating Expenses under Section 1(mm) of the Earn-Out Agreement. These expenses do not qualify for exclusion under Section 1(mm)(xiv) of the Earn-Out Agreement because they are not fees and expenses for external or internal audits or for the preparation of any financial statements in accordance with GAAP. These items are necessary for companies transacting business internationally to ensure compliance with various tax laws and are directly related to the ongoing operations of the Business; and<br><br>• The remaining $153,434 of expenses do not qualify for exclusion under Section 1(mm)(xi) as Sellers purport in Exhibit D, tab "b.3", of its Objection Notice. These expenses represent expenses for the development, provision, marketing, sale and other operations related to the Company Products and Services incurred during 2018, and thus, should be included within Operating Expenses pursuant to the Earn-Out Agreement. Furthermore, and without concession that these expenses would not otherwise be included as Operating Expenses pursuant to the terms of the Earn-Out Agreement, the $128,000 credit and the $12,500 credit afforded to Sellers by Buyer, which the Sellers did not dispute, were granted to accommodate miscellaneous accounting related expenses including those which Sellers are now seeking additional credit through this adjustment.<br><br>In each case, with respect to the $914,189 remaining disputed amount, the Buyer has measured and classified such items in accordance with GAAP. | |

| Disputed Item # | Sellers' Explanation[6] | Sellers' Amount[7] | Buyer's Response | Disputed Amount |
|---|---|---|---|---|
| 15 | Headway Expenses under EBITDA – in accordance with agreement reached with the Headway management team and reflected in the collaborative document - Headway Corporate Expenses Reconciliation 2018 – "PNL 2018 + Fcast Q4". Please note that in addition these expenses were not included as Operating Expenses in the Earn-Out Statement of Period 1 (Exhibit A), nor in the reports to the management during 2018 (Exhibit B and C). | $282,134 | The items disputed by Sellers consist of items that were reported by Entravision as operating expense in its 2018 audited financial statements, in accordance with GAAP and consistent with the Earn-Out Agreement.<br><br>Seller's reference to forecasts, estimates or predictions that were contained in reports to management (in this case prepared by Paula Velasco, who is a third-party consultant), are not binding on Buyer, nor do these kinds of reports waive or modify the parties' Earn-Out Agreement (e.g., Sections 9(e) and 9(f)). | $282,134 |
| 16 | Bad debt Reserve – In accordance with the information provided by the Buyer, the allowance for bad debt expense represents 1.3% of the sales of Headway. In accordance with the experience of Headway and considering what was previously agreed among the Buyer and the Sellers at the time of calculating the Earn-Out Statement for Period 1 (Exhibit A), allowance for Bad debt should amount to 0.5% of the sales of Headway. The 0.5% assumption was based upon historical write-off amounts. By this unreasonable and unfounded increase in this percentage, the Buyer is not acting in good faith jeopardizing the rights of the Sellers to reach the targets. Please note that this increase was not reflected in the reports shared by the Buyer to the Headway management team during Period 2 (Exhibit B and C). | $544,931 | The $544,931 bad debt expense represents expense attributable to accounts receivables deemed uncollectable during Period 2. In accordance with GAAP, and consistent with the terms of the Earn-Out Agreement, accounts receivable are evaluated periodically for potential impairment taking into consideration a variety of factors including past events and conditions as of any given reporting date. During the periodic impairment reviews that occurred during 2018, the consistent application of GAAP resulted in an increase in bad debt expense, in part because accounts receivables continued to age and adjustment to the allowance for doubtful accounts was deemed necessary under GAAP. | $544,931 |

| Disputed Item # | Sellers' Explanation[6] | Sellers' Amount[7] | Buyer's Response | Disputed Amount |
|---|---|---|---|---|
| 17 | Currency Revaluation – Account No. 91-0000. The Buyers are including as an Operating Expense the effects of the currency conversion. Headway's core business is not related to currency exchange operations and management cannot control the effect of currency on its business. As a result, this adjustment should not be considered under EBITDA just as it was agreed between the Buyer and the Sellers at the time of the calculation of Earn-Out Statement for Period 1 (Exhibit A) and reported by the Buyer to the Headway management team during Period 2 (Exhibit B and C). Headway management was never exposed to the details of the impact of foreign exchange on the business throughout the year. | $1,755,042 | The $1,755,042 foreign currency expense represents actual expenses incurred by the Business related to the development, provision, marketing, sale and other operations related to Company Products and Services during 2018.  Accordingly, and as an entity conducting business internationally both before and after the acquisition, foreign currency expense represents actual operational losses incurred during any given period. Consequently, inclusion as Operating Expenses is consistent with the terms of the Earn-Out Agreement, including the requirement that Operating Expenses be calculated in accordance with GAAP.<br><br>Furthermore, Buyer's exclusion of foreign currency expense during the Period 1 Earn-Out Statement was, in part, because such expenses were attributable to acquisition related activities, and thus, excluded from Operating Expenses by Buyer in its Period 1 Earn-Out Statement.  In contrast, the $1,755,042 is unrelated to acquisition related activities and solely the expenses of the Business incurred to conduct its operations during Period 2.  It should also be noted that Sellers' management represented to Buyer's during diligence that it had procedures in place to mitigate foreign currency exposure (as would be expected for an entity conducting business internationally) and, consistent with the Sellers' representations on which Buyer relied, the levels of foreign currency expenses in the Period 1 Earn-Out Statement were relatively inconsequential; a stark contrast to the expense incurred by the Business during Period 2.<br><br>Seller's reference to forecasts, estimates or predictions that were contained in reports to management (in this case prepared by Paula Velasco, who is a third-party consultant), are not binding on Buyer, nor do these kinds of reports waive or modify the parties' Earn-Out Agreement (e.g., Sections 9(e) and 9(f)). | $1,755,042 |
| | Total: | $3,621,639 | | $3,618,742 |

10

# Period 3 Disputed Items

AA 691

**Exhibit A-1**
**Disputed Items – Buyer's Adjustments**

| Disputed Item # | Buyer's Description[1] | Disputed Amount[2] | Sellers' Explanation[3] | Buyer's Response |
|---|---|---|---|---|
| 1 | Adjustment To Exclude 2018 Revenue Reversals Recorded In Error During 2019 (Out Of Period And Adjusted For By Buyer In Period 2) | $547,709 | The Earn-Out Agreement, § 1(ff) requires Buyer to calculate Net Revenue in compliance with GAAP, which is defined as U.S. Generally Accepted Accounting Principles, "as consistently applied by Buyer." Id., § 1(dd).<br><br>Here, Entravision Communications Corporations' ("EVC") 2019 10-K (and G/L), which complies with GAAP, reported Headway's Net Revenue in the amount of $56,419,380 — a number that includes this $547,709 of 2018 revenue reversals in 2019.<br><br>Therefore, Seller Representative objects to Buyer making this Net Revenue adjustment solely for purposes of the Period 3 Earn-Out Statement because it does not comply with GAAP "as consistently applied by Buyer," in violation of Section 1(dd). | This entry is required to correct the 2019 P&L error resulting from the recognition of 2018 revenue reversals during 2019. Failure to include this adjustment would result in understated income during Period 3, and thus, Sellers' proposed adjustment is inconsistent with the terms of the Earn-Out Agreement, including the requirement that Net Revenue and/or EBITDA be calculated in accordance with GAAP.<br><br>Furthermore, Sellers conceded that $222,090 of the $547,709 revenue reversals recorded in error during 2019 (out of period) should be included as an adjustment to Period 2 Net Revenue.[4] The effect of Sellers' proposed adjustment to the Period 3 Earn-Out Statement would both inappropriately include duplicative revenue reversals during Period 2 and Period 3 (to the detriment of Sellers) and violate GAAP. |

[1] *See* Buyer's Period 3 Earn-Out Statement.
[2] *See* Sellers' Objection Notice.
[3] *See* Sellers' Objection Notice.
[4] *See* Sellers' Period 2 Objection letter dated June 14, 2019.

**EXHIBIT 12**

| Disputed Item # | Buyer's Description[1] | Disputed Amount[2] | Sellers' Explanation[3] | Buyer's Response |
|---|---|---|---|---|
| 2 | Adjustment to correct revenue and unbilled accounts receivable as of December 31, 2019 (*see* March 16, 2020 mgmt. rep letter, Appendix A, Item #s 2 and 17). | $(158,609) | The Earn-Out Agreement, § 1(ff) requires Buyer to calculate Net Revenue in compliance with GAAP, which is defined as U.S. Generally Accepted Accounting Principles, "as consistently applied by Buyer." Id., § 1(dd).<br><br>Here, EVC's 2019 10-K (and G/L), which complies with GAAP, reported Headway's Net Revenue in the amount of $56,419,380—a number that does not include this $158,609 error correction.<br><br>Therefore, Seller Representative objects to Buyer making this Net Revenue adjustment solely for purposes of the Period 3 Earn-Out Statement because it does not comply with GAAP "as consistently applied by Buyer," in violation of Section 1(dd). | The $158,609 adjustment is required to reverse revenue recorded in error during 2019. Failure to record this adjustment would result in overstated Net Revenue during Period 3, and thus, Sellers' proposed adjustment is inconsistent with the terms of the Earn-Out Agreement, including the requirement that Net Revenue and/or EBITDA be calculated in accordance with GAAP. |
| 3 | Adjustment to exclude the reversal (credit) recorded during 2019 relating to unpaid bonus accrued for Key Employees. | $898,000 | Seller Representative objects to the total amount of $898,000 for this adjustment. Buyer's response to Seller Letter #4 refused to provide further information regarding the "Bonus Accrual Adjustment" because it "does not relate to the calculation of any Earn-Out Payments." Taking | While Sellers correctly point out that a portion of this amount does not relate to Key Employees, and rather includes bonuses payable to Phantom Stock Holders under the Earn-Out Agreement, the adjustment to exclude from Operating Expenses the $898,000 bonus accrual reversal is required under the terms of the Earn-Out Agreement. |

**EXHIBIT 12**

| Disputed Item # | Buyer's Description[1] | Disputed Amount[2] | Sellers' Explanation[3] | Buyer's Response |
|---|---|---|---|---|
| | | | Buyer's representation as true, this entire adjustment should be excluded from Buyer's calculation of the Period 3 Earn-Out Statement.<br><br>However, assuming the $898,000 bonus expense reversal in 2019 does relate to the $2,514,992 expensed in 2018 for Key Employees, only $307,354 of the 2019 bonus accrual reversal relates to Key Employees, Kogan ($116,807.59), Coll ($116,807.59) and L'Hopital ($73,739.20). The remaining amount of the 2019 bonus accrual reversal ($590,646) does not relate to Key Employees, as defined by Earn-Out Agreement, § 1(ee). Therefore, any adjustment for a 2019 bonus accrual reversal related to Key Employees would only amount to $307,354. | Sellers have no basis on which to argue otherwise.<br><br>Specifically, the Earn-Out Agreement Section 1(mm)(xx) requires that the following be excluded from Operating Expenses: "the aggregate of all Selling Expenses and **Employee Payments** (as such terms are defined in the Purchase Agreement)." Emphasis added. The Purchase Agreement defines Employee Payments in relevant part as "**bonus amounts**, **deferred bonus or phantom stock payments** (including those payable to the Phantom Stock Holders pursuant to the Phantom Stock Agreements) **payable** to directors, managers, officers, agents and consultants of any Acquired Company **as a result of the transactions contemplated by this Agreement and unpaid by the Acquired Companies as of the Closing Date**."[5] Emphasis added. The Earn-Out Agreement Section 4(d) states that "[a]ny payments owing by Buyer [attributable to a Earn-Out Payment, True-Up Amount, or Overachievement Bonus] will be allocated between the **Phantom Stock Holders and the Sellers** pursuant to Exhibit B." Emphasis |

[5] There can be no doubt that such bonus amounts are the direct result of the transactions contemplated by the Purchase Agreement. The Purchase Agreement states at Section 2.5 that "[a]t the Closing, the Buyer will execute and deliver to the Sellers the Earn-Out Agreement, which Earn-Out Agreement is hereby incorporated by reference. The parties acknowledge and agree that any payments actually made by the Buyer under the Earn-Out Agreement will be related to the acquisition of the Acquired Company Interests, and as a result any payments made under the Earn Out Agreement will be deemed an increase in the Purchase Price." Emphasis added. And, as the very nature of the accrual implies, these bonus amounts were unpaid as of the Closing Date.

**EXHIBIT 12**

| Disputed Item # | Buyer's Description[1] | Disputed Amount[2] | Sellers' Explanation[3] | Buyer's Response |
|---|---|---|---|---|
| | | | | added. Therefore, because the accrual reversal relates directly to Employee Payments it must be excluded from Operating Expenses.<br><br>Furthermore, the Buyer has included, and Sellers have received the benefit of, the add-backs of *these same bonus expenses and prior accruals* during previous periods. Sellers' proposed adjustment here inappropriately seeks a windfall through the Earn-Out mechanism and Buyer's obligation to account for Headway's Period 3 performance which was well below expectations at the time of the Closing. |
| 4 | Operating Expense exclusion of up to $800,000 pursuant to Section 1(mm)(xxi) of the Earn-Out Agreement, subject to Seller's submission of information establishing compliance with applicable conditions. | $(800,000) | On December 7, 2018, EVC's CFO, Chris Young sent an email to Kogan, attached as Exhibit 1 hereto, approving the 2019 Headway budget and agreeing to add-back $800,000 in Operating Expenses for Period 3, pursuant to the Earn-Out Agreement, § 1(mm)(xxi). See also id., § 1(mm)(x) (". . . the following expenses, items and amounts will be excluded from Operating Expenses: . . . (xxiii) any other items reasonably identified and agreed between the Buyer and the Key Employees in accordance with Section 5.(a)."). <br><br>Therefore, Buyer is required to add- | In order to qualify for exclusion from Operating Expenses under Section 1(mm)(xxi), Sellers are required, *inter alia*, to demonstrate that any such items were actually incurred during 2019 and specifically identified in the 2019 Operating Budget as items to be excluded, consistent with Buyer's letter to the Sellers dated June 11, 2018. Sellers have not provided any information to establish that their proposed adjustment complies with these requirements. <br><br>Furthermore, the e-mail from Chris Young attached as Exhibit 1 to Sellers' May 8, 2020 Objection letter in which Mr. Young approved the exclusion of $800,000 from Period 3 Operating Expenses was subject to Sellers' |

**EXHIBIT 12**

| Disputed Item # | Buyer's Description[1] | Disputed Amount[2] | Sellers' Explanation[3] | Buyer's Response |
|---|---|---|---|---|
| | | | back $800,000 in Operating Expenses for purposes of calculating the Period 3 Earn-Out Statement. | requirements under Section 1(mm)(xxi). This does not and should not be construed by Sellers to qualify under Section 1(mm)(xxiii) as "any other items reasonably identified and agreed between the Buyer and the Key Employees in accordance with Section 5.(a)." |
| 5 | Operating Expense exclusion pursuant to Section 1(mm)(xxvii) of the Second Amendment to Earn-Out Agreement. | $(541,258) | On December 7, 2018, Buyer's CFO, Chris Young sent an email to Kogan (Ex. 1) approving the 2019 Headway budget and agreeing to add-back approximately $541,000 in Smadex Operating Expenses for Period 3, pursuant to the Second Amendment to the Earn-Out Agreement, § 1(mm)(xxvii). See also id., § 1(mm)(x) (". . . the following expenses, items and amounts will be excluded from Operating Expenses: . . . (xxiii) any other items reasonably identified and agreed between the Buyer and the Key Employees in accordance with Section 5.(a)."). <br><br>Therefore, Buyer is required to add-back $541,258 in Smadex Operating Expenses for purposes of calculating the Period 3 Earn-Out Statement. | In order to qualify for exclusion from Operating Expenses under Section 1(mm)(xxvii), Sellers are required, *inter alia*, to demonstrate that any such items were actually incurred during 2019 and that the following conditions are met: (a) such Operating Expenses are specifically identified as an item to be excluded from Operating Expenses pursuant to a written request by the Sellers Representative to Buyer setting forth detailed information regarding the intended use and amount of such investment and the related return on such investment, and (b) such request is approved in writing by Buyer, in Buyer's sole and absolute discretion, consistent with Buyer's letter to the Sellers dated June 11, 2018.<br><br>Sellers have not provided any information to establish that their proposed adjustment complies with these requirements.<br><br>Furthermore, the e-mail from Chris Young attached as Exhibit 1 to Sellers' May 8, 2020 Objection letter in which Mr. Young approved |

**EXHIBIT 12**

| Disputed Item # | Buyer's Description[1] | Disputed Amount[2] | Sellers' Explanation[3] | Buyer's Response |
|---|---|---|---|---|
| | | | | the exclusion of $541,000 from Period 3 Operating Expenses was subject to Sellers' requirements under Section 1(mm)(xxvii) of the Second Amendment to Earn- Out Agreement.  This does not and should not be construed by Sellers to qualify under Section 1(mm)(xxiii) as "any other items reasonably identified and agreed between the Buyer and the Key Employees in accordance with Section 5.(a)." |
| 6 | Interest on loan made by Seller Representative to Acquired Companies. | $15,000 | According to the Period 3 Earn-Out Statement, this amount relates to "[i]nterest on loan made by Seller Representative to Acquired Companies." <br><br> However, Earn-Out Agreement, §1(mm)(x) provides "that the following expenses, items and amounts will be excluded from Operating Expenses: . . . (xix) interest on loans by the Buyer to the Acquired Companies to the extent such loans do not exceed the amount, if any, of cash dividends made by the Acquired Companies to the Buyer or any of its Affiliates." <br><br> Therefore, pursuant to Earn-Out Agreement, § 1(mm)(xix), this amount—which admittedly | The $15,000 adjustment relates to a loan made by Buyer to the Acquired Companies, and is therefore subject to Section 1(mm)(xix) of the Earn-Out Agreement, in which the parties agreed that Operating Expense would exclude "interest on loans by the Buyer to the Acquired Companies to the extent such loans do not exceed the amount, if any, of cash dividends made by the Acquired Companies to the Buyer or any of its Affiliates." Emphasis added. The Acquired Companies have made no such cash dividends to Buyers or any of its affiliates and, consequently, the entire loan amount exceeds the amount of cash dividends made by the Acquired Companies. Accordingly, total interest incurred during 2019 attributable to this loan must be included in Operating Expenses in accordance with the Earn-Out Agreement Section 1(mm)(xix). |

**EXHIBIT 12**

| Disputed Item # | Buyer's Description[1] | Disputed Amount[2] | Sellers' Explanation[3] | Buyer's Response |
|---|---|---|---|---|
| | | | constitutes interest on loans—should be excluded from EBITDA for purposes of calculating the Period 3 Earn-Out Statement. | |
| 7 | Expenses related to marketing and public relation related to Company Products and Services. | $7,595 | Earn-Out Agreement, § 1(mm)(iv), only allows Buyer to include "expenses relating to marketing and public relations related to Company Products and Services to the extent consistent with the historical operations of the Business (after accounting for any growth of the Business after the Closing) or mutually agreed upon."<br><br>Furthermore, Earn-Out Agreement,§§ 1(mm)(x) provides "that the following expenses, items and amounts will be excluded from Operating Expenses: . . . (xii) all marketing or promotional expense not included in clause '(iv)' above."<br><br>Here, inclusion of these expenses incurred by Buyer is not consistent with the historical operations of Headway and was not agreed to by the Sellers.<br><br>Therefore, pursuant to Earn-Out Agreement §§ 1(mm)(iv), (x), | The $7,595 adjustment represents expenses for the marketing and public relations of Company Products and Services, and thus, inclusion as Operating Expenses is consistent with Section 1(mm)(iv) of the Earn-Out Agreement. During Period 2, the Company's marketing and public relations function (including associated expense) was transitioned from the local marketing and public relations firm to The Plunkett Group. The $7,595 amount was derived by taking the total marketing and public relations service fees charged by The Plunkett Group post-transition, multiplied by the pro-rata portion of fees attributable to Headway by dividing the number of Headway specific press releases (2) by the total number of press releases issued during 2019 (42). Consequently, this amount is directly related to the marketing and sale of Headway Products and Services during 2019, consistent with the historical operations of Headway, and thus, must be included within Operating Expenses. |

**EXHIBIT 12**

| Disputed Item # | Buyer's Description[1] | Disputed Amount[2] | Sellers' Explanation[3] | Buyer's Response |
|---|---|---|---|---|
| | | | (xii), these expenses should be excluded from Operating Expenses for purposes of the Period 3 Earn-Out Statement. | |
| 8 | Expenses attributed to Headway controller (U.S.). | $144,200 | Earn-Out Agreement, § 1(mm)(x) provides "that the following expenses, items and amounts will be excluded from Operating Expenses: . . . (xi) any general allocation of corporate overhead, including corporate administrative, maintenance and reporting services and software incurred in connection with the Business (e.g. *corporate accounting*, corporate human resources and corporate legal expenses) . . .". (emphasis added).<br><br>Therefore, in accordance with Earn-Out Agreement, §§ 1(mm)(x), (xi), any general allocation of corporate overhead, including this corporate accounting expense attributable the U.S. Headway controller, should be excluded from Operating Expenses for purposes of calculating the Period 3 Earn-Out Statement.<br><br>The fact that Buyer excluded a similar expense for "U.S. accounting salary ($105,000)" from Operating Expenses | The $144,200 expense attributable to the Headway Controller's salary as Operating Expenses is consistent with the terms of the Earn-Out Agreement, including Section 1(mm)(vii). The Headway Controller's role and responsibilities included managing the accounting, bookkeeping, and financial reporting with respect to the Business. Notably, these roles and responsibilities *did not include corporate accounting*, and so this expense is distinct from the expense Sellers point to in Period 1. Consequently, this $144,200 expense amount must be included within Operating Expenses. |

**EXHIBIT 12**

| Disputed Item # | Buyer's Description[1] | Disputed Amount[2] | Sellers' Explanation[3] | Buyer's Response |
|---|---|---|---|---|
| | | | in Period 1, pursuant to Earn-Out Agreement,§§ 1(mm)(x), (xi), further supports excluding this expense in Period 3 under the exact same provision. | |
| 9 | Expense attributed to consulting fees related to the development, provision, marketing, sale and other operations related to the Business. | $282,683 | Earn-Out Agreement, § 1(mm)(ii) provides that Operating Expenses can only include "fees, expenses and costs relating to compensation and benefits (including any related payroll, social security or other Taxes) for all employees (including the Key Employees) or independent contractors (including as a result of any incentive plans implemented in accordance with the Operating Budget), and mutually agreed upon compensation allocable to the Business in respect of any employees or independent contractors of the Buyer (and its Affiliates) in connection with the Business." (emphasis added).<br><br>Additionally, in accordance with Earn-Out Agreement, §§ 1(mm)(x), (xi), any general allocation of corporate overhead, such as the consulting services required by Buyer, should not be included as an Operating Expense. | As Sellers acknowledge, the $282,683 expense is attributable to consulting services provided by SWS Services des Estrategia SC ("SWS"). SWS is a consulting company that provided services during Period 3 related to the development, provision, marketing, sale and other operations related to Headway Products and Services, and must be included within Operating Expenses under the terms of the Earn-Out Agreement, including Section 1(mm).<br><br>Total fees paid to SWS during 2019 were $565,367, at least 80% of which was directly related to the development, provision, marketing, sale, and/or other operations related to Headway Products and Services. In an effort to quantify these Operating Expenses in good faith, Buyer (conservatively) allocated only 50% ($282,683 = $565,367 x 50%) of these fees as Operating Expenses during Period 3.<br><br>SWS is owned and operated by Juan Saldivar, who also serves as a member of Entravision's Board of Directors. However, the amounts |

**EXHIBIT 12**

| Disputed Item # | Buyer's Description[1] | Disputed Amount[2] | Sellers' Explanation[3] | Buyer's Response |
|---|---|---|---|---|
| | | | Here, Seller Representative understands that this expense for consulting fees relates to compensation for the entity "SWS" and its principal, Juan Salvidar—whose role was previously performed by a corporate employee of Buyer. Seller Representative never agreed to allocate said compensation to Headway.<br><br>Therefore, pursuant to Earn-Out Agreement, §§ 1(mm)(ii), (x), (xi), Buyer cannot allocate its corporate overhead and include SWS' compensation as an Operating Expense for purposes of calculating the Period 3 Earn-Out Statement. | attributed to this item solely represent fees paid to SWS for work related to the Headway Business, and did not include any amounts received by Mr. Saldivar for his service as a Board member. |
| 10 | Adjustment to correct overstatement of expenses recorded during 2019 (*see* March 16, 2020 mgmt. rep. letter, Appendix A, Item #7 and 8). | $(861,687) | This adjustment inappropriately reduces Period 2 EBITDA by $118,751. Seller Representative objects to any attempt to revise the Period 2 Earn-Out Statement in the Period 3 Earn-Out Statement.<br><br>The Earn-Out Agreement, § 1(dd) requires Buyer to calculate all Earn-Out Statements using GAAP "as consistently applied by Buyer."<br><br>Here, BDO and EVC passed on | The $861,687 adjustment is required to correct the 2019 P&L error resulting from the overstatement of operating expenses. Failure to include this adjustment would result in an overstatement of Operating Expenses. Consequently, this adjustment is required under the terms of the Earn-Out Agreement, including the requirement that Operating Expenses be calculated in accordance with GAAP.<br><br>Furthermore, of the $861,687: |

**EXHIBIT 12**

| Disputed Item # | Buyer's Description[1] | Disputed Amount[2] | Sellers' Explanation[3] | Buyer's Response |
|---|---|---|---|---|
| | | | recording this adjustment in Headway's 2019 G/L to correct 2018 SG&A expenses recorded in 2019.<br><br>Moreover, Headway's reported operating expenses in EVC's 2019 10-K (and G/L), which complies with GAAP, does not include this $118,751 error correction.<br><br>BDO and EVC also passed on recording this adjustment in Headway's 2019 G/L to correct overstated 2019 SG&A expenses.<br><br>Headway's reported operating expenses in EVC's 2019 10-K (and G/L), which complies with GAAP, also does not include this $742,936 error correction.<br><br>Therefore, Buyer cannot make either of these revisions to the Period 2 Earn-Out Statement in the Period 3 Earn-Out Statement because doing so violates the Earn-Out Agreement, § 1(dd), which requires Buyer to calculate all Earn-Out Statements in compliance with GAAP "as consistently applied by Buyer." | • $742,936 relates to expenses recorded in error during 2019 that relate to 2020 (*see* March 16, 2020 mgmt. rep. letter, Appendix A, Item #7). Buyer has made no adjustment to the Period 2 Earn-Out Statement for this item.<br><br>• $118,751 relates to expenses recorded in error during 2019 that relate to 2018 (*i.e.*, Period 2; *see* March 16, 2020 mgmt. rep. letter, Appendix A, Item #8). Here again, Buyer has made no adjustment to the Period 2 Earn-Out Statement for this item. Buyer did adjust for this item in the Period 3 Earn-Out Statement in determining the True-Up Amount (*see* Letter dated March 27, 2020 re: Earn-Out Statement (Period 3): True-Up Amount, Exhibit B-1) and Overachievement Bonus (*see* Letter dated March 27, 2020 re: Earn-Out Statement (Period 3): Overachievement Bonus, Exhibit B-2). These adjustments must be included in determining the True-Up Amount and Overachievement Bonus because such amount and bonus are based on "... actual EBITDA realized during the Aggregate Earn-Out Period...",[6] which necessarily includes adjustments in accordance with GAAP of which Buyer is now aware. |

[6] *See* Earn-Out Agreement Section 3(d) and 3(f).

**EXHIBIT 12**

| Disputed Item # | Buyer's Description[1] | Disputed Amount[2] | Sellers' Explanation[3] | Buyer's Response |
|---|---|---|---|---|
| 11 | Adjustment to exclude the write-off of overstated accounts receivables recorded in error during 2019 (out of period and adjusted for by Buyer in Period 2). | $(537,973) | The Earn-Out Agreement, § 1(dd) requires Buyer to calculate all Earn-Out Statements using GAAP "as consistently applied by Buyer."<br><br>Here, Headway's reported operating expenses in EVC's 2019 10-K (and G/L), which complies with GAAP, include this $537,973 amount as a 2019 operating expense.<br><br>Therefore, Seller Representative objects to Buyer making this adjustment solely for purposes of the Period 3 Earn-Out Statement because it does not comply with GAAP "as consistently applied by Buyer," in violation of Section 1(dd). | The $537,973 adjustment is required because its effect properly excludes from Operating Expenses the write-off of unsubstantiated debits (*i.e.*, unsubstantiated assets) relating to Period 2 but recorded in error during Period 3. Sellers' proposed adjustment would result in an overstatement of Period 3 Operating Expenses, inconsistent with the terms of the Earn-Out Agreement, including the requirement that Operating Expenses be calculated in accordance with GAAP. |
| 12 | Adjustment to exclude penalties and interest recorded during 2019 in connection with 2016 VAT payable (out of period and adjusted for by Buyer in Period 2). | $(436,652) | The Earn-Out Agreement, § 1(dd) requires Buyer to calculate all Earn-Out Statements using GAAP "as consistently applied by Buyer."<br><br>Here, Headway's reported operating expenses in EVC's 2019 10-K (and G/L), which complies with GAAP, include this $436,652 amount as a 2019 operating expense.<br><br>Therefore, Seller Representative | These expenses relate to penalties charged for failure to comply with VAT legal requirements prior to 2019. Sellers' proposed adjustment would result in an overstatement of Period 3 Operating Expenses, inconsistent with the terms of the Earn-Out Agreement, including the requirement that Operating Expenses be calculated in accordance with GAAP. |

**EXHIBIT 12**

| Disputed Item # | Buyer's Description[1] | Disputed Amount[2] | Sellers' Explanation[3] | Buyer's Response |
|---|---|---|---|---|
| | | | objects to Buyer making this adjustment solely for purposes of the Period 3 Earn-Out Statement because it does not comply with GAAP "as consistently applied by Buyer," in violation of Section 1(dd). | |
| 13 | Adjustment to exclude agency commission accruals recorded during 2019 related to 2018 (out of period and adjusted for Buyer in Period 2). | $(212,607) | The Earn-Out Agreement, § 1(dd) requires Buyer to calculate all Earn-Out Statements using GAAP "as consistently applied by Buyer."<br><br>Here, Headway's reported operating expenses in EVC's 2019 10-K (and G/L), which complies with GAAP, include this $212,607 amount as a 2019 operating expense.<br><br>Therefore, Seller Representative objects to Buyer making this adjustment solely for purposes of the Period 3 Earn-Out Statement because it does not comply with GAAP "as consistently applied by Buyer," in violation of Section 1(dd). | These expenses relate to agency commissions attributable to Period 2 but recorded in error during Period 3. Sellers' proposed adjustment would result in an overstatement of Period 3 Operating Expenses, inconsistent with the terms of the Earn-Out Agreement, including the requirement that Operating Expenses be calculated in accordance with GAAP. |
| 14 | Adjustment to exclude cost of sales recorded during 2019 associated with prior year revenue (see March 16 2020 mgmt. rep. letter, | $(125,000) | This adjustment inappropriately reduces Period 2 EBITDA by $125,000. As stated above, Seller Representative objects to any revision of the Period 2 Earn-Out Statement in the Period 3 Earn-Out | These expenses relate to Period 2 and were recorded in error during Period 3. Sellers' proposed adjustment would result in an overstatement of Period 3 Operating Expenses, inconsistent with the terms of the Earn-Out Agreement, including the |

**EXHIBIT 12**

| Disputed Item # | Buyer's Description[1] | Disputed Amount[2] | Sellers' Explanation[3] | Buyer's Response |
|---|---|---|---|---|
| | Appendix A, Item #3). | | Statement.<br><br>The Earn-Out Agreement, § 1(dd) requires Buyer to calculate all Earn-Out Statements using GAAP "as consistently applied by Buyer."<br><br>Here, BDO and EVC passed on recording this adjustment in Headway's 2019 G/L to correct 2018 cost of sales recorded in 2019.<br><br>Moreover, Headway's reported cost of sales in EVC's 2019 10-K (and G/L), which complies with GAAP, does not include this $125,000 error correction.<br><br>Therefore, Buyer is not permitted to make this revision to the Period 2 Earn-Out Statement in the Period 3 Earn-Out Statement because doing so violates the Earn-Out Agreement, § 1(dd), which requires Buyer to calculate all Earn-Out Statements in compliance with GAAP "as consistently applied by Buyer." | requirement that Operating Expenses be calculated in accordance with GAAP.<br><br>Buyer has made no adjustment to the Period 2 Earn-Out Statement for this item. Buyer did adjust for this item in the Period 3 Earn-Out Statement in determining the True-Up Amount (*see* Letter dated March 27, 2020 re: Earn-Out Statement (Period 3): True-Up Amount, Exhibit B-1) and Overachievement Bonus (*see* Letter dated March 27, 2020 re: Earn-Out Statement (Period 3): Overachievement Bonus, Exhibit B-2). This adjustment must be included in determining the True-Up Amount and Overachievement Bonus because such amount and bonus are based on "... actual ABITDA realized during the Aggregate Earn-Out Period...",[7] which necessarily includes adjustments in accordance with GAAP of which Buyer is now aware. |
| 15 | Adjustment to correct for understatement of expenses during 2019 | $215,666 | The Earn-Out Agreement, § 1(dd) requires Buyer to calculate all Earn-Out Statements using GAAP "as | This $215,666 adjustment relates to sales, bonus, and general expenses of the Business and is required to correct an understatement |

[7] *See* Earn-Out Agreement Section 3(d) and 3(f).

**EXHIBIT 12**

| Disputed Item # | Buyer's Description[1] | Disputed Amount[2] | Sellers' Explanation[3] | Buyer's Response |
|---|---|---|---|---|
| | (see March 16, 2020 mgmt. rep. letter, Appendix A, Item #15 and 16). | | consistently applied by Buyer." Here, BDO and EVC passed on recording this adjustment in Headway's 2019 G/L to correct 2019 expenses. Moreover, Headway's reported operating expenses in EVC's 2019 10-K (and G/L), which complies with GAAP, does not include this $215,666 error correction. Therefore, Seller Representative objects to Buyer making this adjustment solely for purposes of the Period 3 Earn-Out Statement because it does not comply with GAAP "as consistently applied by Buyer," in violation of Section 1(dd). | of operating expenses recorded during Period 3. Sellers' proposed adjustment would result in an understatement of Period 3 Operating Expenses, inconsistent with the terms of the Earn-Out Agreement, including the requirement that Operating Expenses be calculated in accordance with GAAP. |
| 16 | Adjustment to reclassify and properly record as operating expenses items that were classified in error as income tax expense. | $195,440 | The Earn-Out Agreement, § 1(dd) requires Buyer to calculate all Earn-Out Statements using GAAP "as consistently applied by Buyer." Here, BDO and EVC passed on recording this reclassification in Headway's 2019 G/L to correct 2019 expenses. Moreover, Headway's reported | The $195,440 adjustment is required to properly classify non-income tax related expenses as Operating Expenses during 2019, consistent with the Earn-Out Agreement, including the requirement that Operating Expenses be calculated in accordance with GAAP. |

**EXHIBIT 12**

| Disputed Item # | Buyer's Description[1] | Disputed Amount[2] | Sellers' Explanation[3] | Buyer's Response |
|---|---|---|---|---|
| | | | operating expenses and income tax expense in EVC's 2019 10-K (and G/L), which complies with GAAP, does not include this $195,440 reclassification.<br><br>Therefore, Seller Representative objects to Buyer making this adjustment solely for purposes of the Period 3 Earn-Out Statement because it does not comply with GAAP "as consistently applied by Buyer," in violation of Section 1(dd). | |
| | **Total:** | **$(1,367,493)** | | |

**EXHIBIT 12**

**Exhibit A-2**
**Disputed Items – Sellers' Adjustments**

| Disputed Item # | Sellers' Explanation[8] | Sellers' Amount[9] | Buyer's Response | Disputed Amount |
|---|---|---|---|---|
| 17 | In accordance with Earn-Out Agreement, §§ 1(mm)(x), (xi), any general allocation of corporate overhead, including corporate administrative, maintenance and reporting services and software, should be excluded from Operating Expenses. | $(837,923) | As set forth in detail below, the vast majority of these expenses must be included in Operating Expenses in accordance with the terms of the Earn-Out Agreement, including Section 1(mm)(vii) and (ix). However, and as set forth in detail below, upon review of the expenses comprising Sellers' Disputed Item, Buyer agrees to exclude from Operating Expenses $82,161. | $(755,762) |
| | The 2019 G/L includes $91,325 of corporate allocations to Headway for BDO invoices. However, the Period 1 Earn-Out Statement excludes $36,400 from Operating Expenses for BDO expenses in accordance with Section 1(mm)(xi). | | Of the $837,923 adjustment proposed by Sellers: | |
| | The 2019 G/L includes $69,850 of corporate allocations to Headway for Duff & Phelps invoices. However, the Period 1 Earn-Out Statement excludes $71,000 from Operating Expenses for Duff & Phelps expenses in accordance with Section 1(mm)(xi). | | • **Amazon Web Services ($448,147)**: The $448,147 of expenses relate entirely to cloud service expenses attributable to the Business. These expenses must be included in Operating Expenses in accordance with the terms of the Earn-Out Agreement, including Section 1(mm)(vii) and (ix). | |
| | The 2019 G/L includes $11,791 of | | • **Oracle/NetSuite Services ($122,501)**: The $122,501 of expenses relate entirely to the Business' ERP and/or accounting information systems. These expenses must be included in Operating Expenses in accordance with the terms of the Earn-Out Agreement, including Section 1(mm)(vii) and (ix). | |

[8] *See* Sellers' Objection Notice.
[9] *See* Sellers' Objection Notice.

**EXHIBIT 12**

| Disputed Item # | Sellers' Explanation[8] | Sellers' Amount[9] | Buyer's Response | Disputed Amount |
|---|---|---|---|---|
| | corporate allocations to Headway for Protiviti. However, the Period 1 Earn-Out Statement excludes $60,317 from Operating Expenses for Protiviti costs in accordance with Section 1(mm)(xi).<br><br>The 2019 G/L includes $122,501 of corporate allocations to Headway for Oracle and NetSuite costs. However, the Period 1 Earn-Out Statement excludes $25,000 from Operating Expenses for NetSuite in accordance with Section 1(mm)(xi).<br><br>Buyer has no legitimate justification for excluding these expenses in Period 1 pursuant to Section 1(mm)(xi), but not in Period 3. Therefore, Buyer should exclude these expenses from Operating Expenses for purposes of calculating the Period 3 Earn-Out Statement.<br><br>The 2019 G/L includes $94,309 of corporate allocations to Headway for Aspire and Wozwork costs, but these expenses should also be excluded from Operating Expenses in accordance with Section 1(mm)(xi).<br><br>The 2019 G/L include $448,147 of corporate allocations to Headway for | | • **Aspire/Wozwork Services ($94,309):** The $94,309 of expenses related entirely to the Business' ERP and/or accounting information system. These expenses must be included in Operating Expenses in accordance with the terms of the Earn-Out Agreement, including Section 1(mm)(vii) and (ix).<br><br>• **BDO Tax Services ($91,325):** The vast majority of the Period 3 expenses relate to tax services provided by BDO, primarily attributable to transfer pricing services, associated with the Business and qualifies as Operating Expenses under Section 1(mm) of the Earn-Out Agreement. These expenses do not qualify for exclusion under Section 1(mm)(xi) of the Earn-Out Agreement because they do not represent "general allocation of corporate overhead, including corporate administrative, maintenance and reporting services and software incurred in connection with the Business." These services and associated expenses are necessary for companies transacting business internationally to ensure compliance with various tax laws and are directly related to the ongoing operations of the Business. However, upon review, Buyer has identified $520 of charges associated with non-Headway entities, and thus, agrees to exclude those expenses from Operating Expenses.<br><br>• **Duff and Phelps Services ($69,850):** The $69,850 of expenses relate in large part to necessary accounting, bookkeeping and financial reporting | |

**EXHIBIT 12**

| Disputed Item # | Sellers' Explanation[8] | Sellers' Amount[9] | Buyer's Response | Disputed Amount |
|---|---|---|---|---|
| | Amazon Web Services, but these expenses should also be excluded from Operating Expenses in accordance with Section 1(mm)(xi). | | services provided by Duff and Phelps with respect to the Business and allocated to the Business as such. However, upon further review, as a good faith gesture Buyer agrees to exclude these expenses from Operating Expenses for purposes of the Earn-Out Agreement.<br><br>• **Protiviti Services ($11,791)**: The $11,791 of expenses relate to necessary accounting, bookkeeping and financial reporting services provided by Protiviti with respect to the Business and allocated to the Business as such. However, upon further review, as a good faith gesture Buyer agrees to exclude these expenses from Operating Expenses for purposes of the Earn-Out Agreement. | |
| 18 | Rent expense for Grajar S.A., Gonen Tzachi, and Zatel Adrian Ramon was objected to in Period 2 in accordance with Section 1(mm)(xi) and (xiv). | $(169,596) | The $169,596 of expenses relate entirely to rent and related payments pursuant to leases for real estate for use by the Business. These expenses must be included in Operating Expenses in accordance with the terms of the Earn-Out Agreement, including Section 1(mm)(v) of the Earn-Out Agreement which requires "all rent and other payments pursuant to leases for real estate... reasonably allocated for use by the Business..." to be included within Operating Expenses. | $(169,596) |
| 19 | This required deduction relates to Currency Revaluation – Account No. 91-0000.<br><br>However, Buyer cannot include the effects of currency conversion as an | $(200,062) | The $200,062 foreign currency adjustment represents actual expenses incurred by the Business related to the development, provision, marketing, sale and other operations related to Company Products and Services during 2019. Accordingly, and as an entity conducting business internationally both before and after the | $(200,062) |

**EXHIBIT 12**

| Disputed Item # | Sellers' Explanation[8] | Sellers' Amount[9] | Buyer's Response | Disputed Amount |
|---|---|---|---|---|
| | Operating Expense. Headway's core business is not related to currency exchange operations and management cannot control the effect of currency on its business.<br><br>Therefore, this adjustment should not be considered under EBITDA in the Period 3 Earn-Out Statement pursuant to an agreement between Buyer and Sellers regarding this issue at the time of the calculation of Period 1 Earn-Out Statement, and as reported by Buyer to the Headway management team during Period 2. | | acquisition, foreign currency expense represents actual operational losses incurred during any given period. Consequently, inclusion as Operating Expenses is consistent with the terms of the Earn-Out Agreement, including the requirement that Operating Expenses be calculated in accordance with GAAP.<br><br>Furthermore, Buyer's exclusion of foreign currency expense during the Period 1 Earn-Out Statement was, in part, because such expenses were attributable to acquisition related activities, and thus, excluded from Operating Expenses by Buyer in its Period 1 Earn-Out Statement. In contrast, the $200,062 is unrelated to acquisition related activities and solely the expenses of the Business incurred to conduct its operations during Period 3. It should also be noted that Sellers' management represented to Buyer's during diligence that it had procedures in place to mitigate foreign currency exposure (as would be expected for an entity conducting business internationally) and, consistent with the Sellers' representations on which Buyer relied, the levels of foreign currency expenses in the Period 1 Earn-Out Statement were relatively inconsequential; a stark contrast to the expense incurred by the Business during Period 2. | |
| 20 | Section 1(mm)(viii) does not apply to, and was never intended to apply to, any costs associated with severance payments in connection with the | $(782,270) | As an initial matter, Sellers' proposed adjustment is duplicative, in large part, with expenses Seller has already added back (inappropriately) in its independent calculation of Period 3 actual EBITDA. | $(782,270) |

**EXHIBIT 12**

| Disputed Item # | Sellers' Explanation[8] | Sellers' Amount[9] | Buyer's Response | Disputed Amount |
|---|---|---|---|---|
| | wrongful termination of the Sellers and Rodrigo Zabaleta. | | Sellers' starting point for its calculation of Period 3 actual EBITDA ($739,000)[10] was presumably derived from a schedule provided by Entravision setting forth a break-out of Consolidated Adjusted EBITDA, a *non-GAAP* metric used by Entravision for purposes entirely unrelated to the Earn-Out Agreement, that includes as an add-back to net income a severance charge of $603,000 for Martin Kogan, Agustin Coll and Rodrigo Zabaleta. Sellers' proposed adjustment is duplicative with this amount, and thus, must be adjusted for solely on those merits.<br><br>Notwithstanding, Sellers have no basis on which to argue that Section 1(mm)(viii) does not apply to costs associated with the severance of the Sellers and Rodrigo Zabaleta. Without relevant limitation, the express terms of the Earn-Out Agreement Section 1(mm)(viii) states clearly that Operating Expenses shall include "**any** costs, Taxes, or expenses associated with severance paid to **terminated employees**". Emphasis added. Accordingly, these expenses must be included in Operating Expenses in accordance with the terms of the Earn-Out Agreement, including Section 1(mm)(viii). | |
| 21 | This required deduction relates to Bad Debt Reserve.<br><br>In accordance with the information provided by Buyer, the 2019 allowance for bad debt represents | $(1,202,996) | The bad debt expense represents expense attributable to accounts receivables deemed uncollectable during Period 3. In accordance with GAAP, and consistent with the terms of the Earn-Out Agreement, accounts receivable are evaluated periodically for potential impairment taking into | $(1,202,996) |

[10] Sellers' Objection letter, at 18.

**EXHIBIT 12**

| Disputed Item # | Sellers' Explanation[8] | Sellers' Amount[9] | Buyer's Response | Disputed Amount |
|---|---|---|---|---|
|  | 2.6% of the sales of Headway. However, at the time Buyer calculated the Period 1 Earn-Out Statement, Buyer and Sellers agreed that the allowance for bad debt should only amount to 0.5% of the sales of Headway.<br><br>The 2019 Bad Debt Expense – Account No. 51-1090 is $1,485,093.  Therefore, pursuant to Buyer and Sellers' agreement at the time of calculating the Period 1 Earn-Out Statement, Buyer must adjust Bad Debt Reserve for the Period 3 Earn-Out Statement as follows: {$1,485,093 – $282,097 [Net Revenue ($56,419,380) x 0.5%] = $1,202,996}. |  | consideration a variety of factors including past events and conditions as of any given reporting date. During the periodic impairment reviews that occurred during 2019, the consistent application of GAAP resulted in an increase in bad debt expense, in part because accounts receivables continued to age and adjustment to the allowance for doubtful accounts was deemed necessary under GAAP. |  |
| | **Total:** | **$ (3,192,847)** | | **$ (3,110,686)** |

**EXHIBIT 12**